IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| APOTEX, INC., and APOTEX CORP., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| SENJU PHARMACEUTICAL CO., LTD. | ) | **COMPLAINT** |
| KYORIN PHARMACEUTICAL CO., LTD. | ) | |
| and ALLERGAN, INC., | ) | JURY DEMAND |
| | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs Apotex Inc. and Apotex Corp. (collectively "Apotex"), by and through their

attorneys, allege against Defendants Senju Pharmaceutical Co., Ltd., Kyorin Pharmaceutical Co.

Ltd., and Allergan, Inc. (collectively "Defendants") as follows:

## I.      PARTIES

1.      Plaintiff Apotex Inc. is a corporation organized under the laws of Canada, with a

place of business at 150 Signet Drive, Toronto, Ontario, Canada M9L 1T9.

2.      Plaintiff Apotex Corp. is a Delaware corporation with a place of business at 2400

North Commerce Parkway, Suite 400, Weston, Florida, 33326.

3.      Defendant Senju Pharmaceutical Co., Ltd. ("Senju") is a corporation organized

under the laws of Japan having a place of business at 2-5-8, Hirano-machi, Chuo-ku, Osaka 541-

0046, Japan.

4.      Defendant Kyorin Pharmaceutical Co. Ltd. ("Kyorin") is a corporation organized

under the laws of Japan having a place of business at 5, Kanda Surugadai 2-chonie, Chiyoda-ku,

Tokyo 101-8311 Japan.

5.     Defendant Allergan, Inc. ("Allergan") is a Delaware corporation having a place of business at 2525 Dupont Drive, Irvine, California, 92612.

6.     On information and belief, Allegan manufactures, offers for sale, and sells pharmaceutical products throughout the United States, including in this judicial district.

7.     On information and belief, Senju and Kyorin manufacture pharmaceutical products sold throughout the United States, including in this judicial district.

## II.     JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction based on 28 U.S.C §§ 1331 and 1337(a) and 15 USC § 15.

9.     Upon information and belief, venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C §§ 1391(b) and (c) because Defendants transact business within this district and the interstate trade and commerce described in this complaint is carried out, in substantial part, in this district.

## III.     DEFENDANTS' ANTICOMPETITIVE SCHEME

**A.     Kyorin and Senju scheme to create an unlawful monopoly in the market for gatifloxacin ophthalmic formulations by making misrepresentations to the USPTO to obtain the '045 patent.**

10.     Gatifloxacin is a quinolone antibiotic first patented by researchers at Kyorin in 1990 in U.S. Patent No. 4,980,470 ("the '470 patent").  The '470 patent, which expired in 2010, claims the molecule gatifloxacin and discloses that gatifloxacin may be formulated in various dosage forms, including in eye drops.

11.     As early as 1995, Hiromichi Kodaira and other researchers at Kyorin began formulating aqueous liquid ophthalmic formulations, *i.e.*, eye drops, containing gatifloxacin, disodium edetate, sodium chloride, and other excipients.

2

12.     At that time, however, Kyorin did not seek patent protection for these aqueous liquid ophthalmic formulations of gatifloxacin containing disodium edetate, sodium chloride, and other excipients. On information and belief, Kyorin did not seek additional patent protection for the formulations made by its researchers because Kyorin knew that those formulations would not have been patentable in view of the '470 patent and its knowledge of other ophthalmic formulations.

13.     Instead, Kyorin entered into a license agreement with Senju in 1997 that allowed Senju to develop and market aqueous liquid ophthalmic formulations of gatifloxacin.  The license agreement also required that any patent that might be filed by Senju in the area of gatifloxacin ophthalmic formulations would be jointly assigned to Kyorin and Senju.

14.     After Kyorin and Senju entered into the license agreement, Senju prepared various aqueous liquid ophthalmic formulations containing gatifloxacin and tested them for efficacy.

15.     In August 1998, Senju filed a patent application which named Senju researchers Katsuhiro Inada and Shinichi Yasueda as the only inventors.  The patent application claimed aqueous liquid ophthalmic formulations comprising gatifloxacin and disodium edetate, as well as methods for preparing such formulations.

16.     Inada and Yasueda assigned their rights in the patent application jointly to Senju and Kyorin.

17.     Kyorin participated in the patent prosecution efforts even though it was aware that the compositions claimed in the patent application were first invented by Kyorin researcher Kodaira and his colleagues at Kyorin several years earlier and that the compositions were not invented by Senju's Inada and Yasueda.

3

18.     On December 25, 2001, the patent application naming Inada and Yasueda issued as U.S. Patent No. 6,333,045 ("the '045 patent").  The original claims of the '045 patent read as follows:

> 1. An aqueous liquid pharmaceutical composition which comprises Gatifloxacin or its salt and disodium edetate.

> 2. The aqueous liquid pharmaceutical composition according to claim 1, wherein pH of the composition is within the range of 5 to 8.

> 3. The aqueous liquid pharmaceutical composition according to claim 1, where the composition is in the form of eye drops.

> 4. The aqueous liquid pharmaceutical composition according to claim 1, where the composition is in the form of ear drops.

> 5. The aqueous liquid pharmaceutical composition according to claim 1, where the composition is in the form of nasal drops.

> 6. A method for raising corneal permeability of Gatifloxacin which comprises incorporating disodium edetate into eye drops containing Gatifloxacin or its salt.

> 7. A method for preventing precipitation of Gatifloxacin crystals which comprises incorporating disodium edetate into an aqueous liquid preparation containing Gatifloxacin or its salt.

> 8. A method for preventing coloration of Gatifloxacin which comprises incorporating disodium edetate into an aqueous liquid preparation containing Gatifloxacin or its salt.

> 9. The aqueous liquid pharmaceutical composition according to claim 2, where the composition is in the form of eye drops.

> 10. The aqueous liquid pharmaceutical composition according to claim 2, where the composition is in the form of ear drops.

> 11. The aqueous liquid pharmaceutical composition according to claim 2, where the composition is in the form of nasal drops.

19.     The '045 patent is set to expire on February 20, 2020.

4

**B.      Kyorin and Senju give Allergan a license to market gatifloxacin ophthalmic formulations in the United States, including a license under the '045 patent, and Allergan begins marketing gatifloxacin ophthalmic solution, 0.3%, under the brand name Zymar®.**

20.     In 2000, Kyorin and Senju licensed to Allergan the right—including a license under the '045 patent—to market aqueous liquid gatifloxacin ophthalmic products in the United States.

21.     On May 29, 2002, Allergan filed New Drug Application ("NDA") No. 21-493 on behalf of the Defendants seeking approval to market in the United States gatifloxacin ophthalmic solution, 0.3%, under the brand name Zymar®.

22.     On March 28, 2003, the FDA approved NDA No. 21-493 for Zymar®.

23.     Allergan began marketing Zymar® in the United States shortly after receiving FDA approval.

24.     By 2009, Zymar®'s annual U.S. sales reached approximately $100 million.

**C.      Apotex files an ANDA for gatifloxacin ophthalmic solution, 0.3%, to compete with Defendants.**

25.     In 1984, Congress amended the Federal Food, Drug, and Cosmetic Act by enacting what has become known as the Hatch-Waxman amendments.  One of the primary purposes of the Hatch-Waxman amendments is to expedite availability to the public of lower-cost generic drugs.

26.     Under the Hatch-Waxman amendments, a generic company seeking approval to market a generic version of a brand-name drug can file an Abbreviated New Drug Application ("ANDA") with FDA.

27.     The Hatch-Waxman amendments require NDA applicants to list patents that claim the drug product or an approved use of the drug in FDA's Approved Drug Products with

Therapeutic Equivalence Evaluations ("Orange Book").  A generic drug manufacturer may file

an ANDA seeking approval to market a generic version of a drug that is covered by a patent

listed in the Orange Book provided that it certifies that the patent is invalid or will not be

infringed by the ANDA applicant once it markets its product (a so-called "paragraph IV

certification").  In addition, the ANDA applicant must provide written notification of the

paragraph IV certification to the NDA owner and the patent holder and provide the bases for

patent invalidity and noninfringement.  The first ANDA applicant to file an ANDA with a

paragraph IV certification is entitled to 180 days of marketing exclusivity, during which time

FDA will not give final approval to any other applicant's ANDA for the product.

28.    Filing an ANDA with a paragraph IV certification is a technical act of

infringement that statutorily provides a jurisdictional basis for an NDA applicant to file a patent

infringement lawsuit.  If within 45 days of receiving an ANDA applicant's notice letter the NDA

applicant files suit, then FDA automatically stays approval of the ANDA for 30 months, unless

there is an earlier decision of invalidity or noninfringement.

29.    Allergan listed three patents in the Orange Book for NDA No. 21-493: the '470

patent, the '045 patent, and U.S. Patent No. 5,880,283 ("the '283 patent") (claiming a particular

crystalline form of gatifloxacin).

30.    On July 18, 2007, Apotex filed ANDA No. 79-084 seeking approval to sell a

generic gatifloxacin ophthalmic solution, 0.3%.

31.    Apotex's ANDA contained paragraph IV certifications to the '283 and '045

patents.  Apotex was the first to file an ANDA for gatifloxacin ophthalmic solution, 0.3%, that

contained a paragraph IV certification.  Accordingly, the filing provides Apotex the right to 180

days of marketing exclusivity.  Apotex also filed a paragraph III certification with respect to the

'470 patent, certifying that Apotex would not market its generic gatifloxacin ophthalmic solution, 0.3%, until that patent (and any applicable extensions to that patent) expired.

32.     As required by the Hatch-Waxman Act, Apotex notified Defendants that Apotex had filed ANDA No. 79-084 seeking approval to sell a generic gatifloxacin ophthalmic solution, 0.3%, and provided to Defendants a letter setting forth that Apotex's proposed ANDA product would not infringe any valid claim of the '283 and '045 patents.

**D.      Defendants file litigation against Apotex to prevent or delay Apotex from marketing its proposed ANDA product in competition with Defendants.**

33.     On November 29, 2007, Defendants sued Apotex alleging infringement of the '283 and '045 patents.  Because Defendants filed their complaint within 45 days of receipt of Apotex's notice letter, Defendants enjoyed an automatic 30-month stay of FDA approval of Apotex's ANDA.

34.     On information and belief, Defendants filed suit against Apotex on the '283 and '045 patents despite knowing that:  (i) Apotex did not use the crystalline gatifloxacin hydrate form claimed in the '283 patent; and (ii) the claims of the '045 patent were invalid as obvious.

35.     On June 23, 2008, Defendants dismissed all claims against Apotex related to the '283 patent.

36.     In approximately May 2009, Defendants were informed by their expert that at least claim 8 of the '045 patent would have been invalid as obvious.

37.     On information and belief, Defendants also knew that because claim 8 was invalid as obvious, as a matter of law, at least claims 1-3 and 9 of the '045 patent also would be obvious. Defendants, however, continued to assert claims 1-3 and 9 against Apotex.

00183382

E.     **Defendants took advantage of the delay arising from the 30-month stay to bring to market a new gatifloxacin ophthalmic solution, 0.5% and to extend their monopoly over gatifloxacin ophthalmic formulations.**

38.     On June 12, 2009, Apotex received tentative approval of its ANDA for gatifloxacin ophthalmic solution, 0.3%.  Because Apotex was still subject to the automatic thirty-month stay triggered by Defendants' lawsuit, in June 2009, Apotex could not then receive final approval or market its gatifloxacin ophthalmic solution, 0.3%.

39.     On July 30, 2009, less than two months after Apotex had received tentative approval of its ANDA, Allergan filed NDA No. 22-548 for gatifloxacin ophthalmic solution, 0.5%, brand name Zymaxid®.

40.     On information and belief, the formulation for Zymaxid® contains the same components in substantially similar concentrations as that for Zymar®, except that the concentration of gatifloxacin contained in Zymaxid® is 0.5% instead of 0.3%, as in Zymar®.

41.     On information and belief, Allergan filed the NDA for Zymaxid® as a new product, rather than as a supplement to the NDA for Zymar®, despite Zymaxid® being the same product with only a higher concentration of gatifloxacin, in an attempt to exclude further competition by obtaining three (3) additional years of regulatory exclusivity for the product and allowing Allergan to list the '283 and '045 patents in the Orange Book and require new certifications against the same patents.

42.     Allergan filed its NDA for Zymaxid® as part of a product switching strategy to deny patients access to Apotex's low cost generic gatifloxacin ophthalmic solution, 0.3%.  When an ANDA is approved, the approved product is given a therapeutic equivalence rating in the Orange Book.  If the ANDA product is given an "A" rating, then FDA has determined that the generic product described in the ANDA is a therapeutic equivalent of the NDA product

8

referenced by the ANDA.

43.     Where an ANDA product receives an "A" rating, absent a prescriber's contrary instruction, the ANDA product may be substituted by pharmacies instead of the referenced NDA product (*i.e.*, the brand name product) when filling a prescription identifying the brand name or the generic name for the drug.

44.     An ANDA product receiving an "A" rating with reference to an NDA may not, however, be substituted by pharmacies for a product approved in another NDA, no matter how similar the NDA products are to one another.  For example, an ANDA product referencing the NDA for Zymar® gatifloxacin ophthalmic solution may not be substituted by a pharmacy when receiving a prescription for Zymaxid® ophthalmic solution.

45.     On May 18, 2010, FDA approved Allergan's NDA No. 22-548 for Zymaxid®.

46.     Upon Zymaxid®'s approval, Allergan listed the '283 and '045 patents in the Orange Book in connection with Zymaxid®.  Allergan listed the '045 patent in the Orange Book despite knowing that the '045 patent was invalid.  Upon launching Zymaxid® in July 2010, Allergan stopped marketing and promoting Zymar® to physicians and marketed and promoted Zymaxid® instead.  Allergan stopped its promotion of Zymar® to physicians in order to dissuade physicians from prescribing Zymar® and to encourage physicians to switch all of their prescriptions for gatifloxacin ophthalmic solution from Zymar® to Zymaxid®.

47.     On information and belief, Zymaxid® does not possess any clinical or therapeutic benefit or superiority in comparison to Zymar®.  On further information and belief, Zymaxid® does not have any greater clinical or therapeutic efficacy than Zymar®.

48.     FDA's approval of Zymaxid® does not give Allergan any right to promote Zymaxid® as having a superior clinical or therapeutic benefit in comparison to Zymar®.

00183382

49.     Indeed, at the time the Zymaxid® NDA was filed, Allergan was aware of studies conducted by Senju that demonstrated that aqueous liquid formulations containing 0.5% gatifloxacin did not demonstrate an increase in efficacy as compared to formulations containing 0.3% gatifloxacin.

**F.      Defendants file a baseless motion for new trial in an effort to buy time to switch sales to their second gatifloxacin ophthalmic solution product and to hinder Apotex's entry.**

50.     On June 14, 2010, the District Court entered an opinion and judgment finding claims 1-3 and 6-9 of the '045 patent invalid as obvious.  Claims 4 and 5, relating to nose and ear drops, were not asserted at trial.

51.     Because Allergan had received FDA approval and had started marketing the second gatifloxacin ophthalmic solution product just a month earlier, Allergan needed more time to complete its switching strategy before Apotex entered the market.  Accordingly, Allergan embarked on a two-pronged strategy to further delay and frustrate Apotex's ability to market a low-cost generic gatifloxacin ophthalmic solution product.

52.     First, Defendants filed a baseless motion seeking a new trial and/or reconsideration on the invalidity of claim 7.  On information and belief, Defendants filed this motion for the sole purpose of instigating further delay independent of the outcome of the motion.

53.     On November 3, 2010, in response to Defendants' motion, the District Court opened its judgment of obviousness with respect to claim 7 of the '045 patent for the limited purpose of allowing the parties to submit additional evidence on the issue of the relationship between the scientific principles of solubility and precipitation.

54.     In April and May 2011, the District Court conducted a two-day evidentiary

hearing to allow the parties to submit additional evidence on the issue of the relationship between the scientific principles of solubility and precipitation.

55.     On December 20, 2011, the Court filed an opinion finding claim 7 of the '045 patent invalid as obvious and re-entered judgment in the case.  In the opinion, the Court concluded that Defendants' additional evidence was "irrelevant at best, and unreliable at worst."

**G.     In the midst of the District Court's supplemental evidentiary proceedings, Defendants committed fraud on the USPTO in their effort to have the USPTO issue a reexamination certificate for the '045 patent that this Court had declared invalid.**

56.     On February 25, 2011, in the midst of the proceedings over Defendants' baseless motion for a new trial before the District Court, Defendants also filed an *ex parte* request for the reexamination of claims 1-3, 6, 8, and 9 of the '045 patent with the United States Patent and Trademark Office ("USPTO") seeking to amend the claims.  At the time of the reexamination request, these six claims were subject to a judgment ruling them invalid as obvious.

57.     As part of the reexamination request, Defendants filed the trial opinion, excerpts of the trial record, and certain expert reports that were favorable to their position on reexamination.

58.     Defendants, however, did not file excerpts of the trial record and expert reports disclosing that Kyorin's researchers had been the first to make and test gatifloxacin ophthalmic formulations covered by the '045 patent claims, nor did they produce evidence which showed that the formulations as claimed by the '045 patent did not exhibit unexpected results, the existence of which could have supported patentability.

59.     Defendants also did not file the deposition testimony by their own expert conceding that preparing the aqueous liquid compositions containing 0.3 w/v% gatifloxacin and 0.01 w/v% disodium edetate would have been obvious based on the well-known use of disodium

edetate to prevent coloration of aqueous liquid drug formulations.

60.     This withheld information was material and shows that the added reexamination claims of the '045 patent were invalid as a matter of law as obvious.  Withheld information also shows that Defendants made a material misrepresentation as to the actual inventors of the subject matter claimed in the reexamination claims.

61.     Defendants also amended reexamination claim 6 knowing that the added limitations to the claimed methods were not supported by the written description of the '045 patent specification, and thus reexamined claim 6 was invalid.

62.     On information and belief, Defendants withheld this invalidating and contradictory material information in an attempt to deceive and mislead the USPTO regarding the patentability of the amended claims.

63.     On information and belief, Defendants sought reexamination claims 1-3, 6, 8, and 9 despite knowing that these reexamination claims in amended form were still invalid as obvious and/or for violating the written description requirement of 35 U.S.C. § 112, ¶1.

64.     Defendants did not inform either the District Court or Apotex when they filed their request for reexamination.

65.     As part of the post-hearing briefing on claim 7, and contemporaneously with the reexamination proceeding, Defendants requested the District Court also reconsider its judgment of the invalidity of claims 1-3 and 9 of the '045 patent in light of the additional evidence they submitted on claim 7.  Nevertheless, shortly after making this request, Senju and Kyorin cancelled claims 1-3, 8, and 9 of the '045 patent in the reexamination proceedings, mooting any issue as to their obviousness.  Senju and Kyorin, however, did not advise the District Court of the reexamination proceeding or that they had cancelled these claims.

00183382

66.     Senju and Kyorin then submitted new claims 12-16 in the reexamination to narrow the scope of the compositions that had been claimed in claims 1-3 and 9, which were dropped.

67.     On information and belief, Senju and Kyorin committed fraud on the USPTO by seeking new claims 12-16 (aqueous liquid compositions comprising gatifloxacin and disodium edetate) which as a matter of law are invalid in light of Defendants' and/or their expert's concession that claim 8 (incorporating disodium edetate into a liquid aqueous gatifloxacin composition for the purpose of preventing coloration) is invalid.

68.     On information and belief, Senju and Kyorin committed fraud on the USPTO by failing to disclose  the Kyorin's researchers' prior invention of gatifloxacin ophthalmic formulations containing disodium edetate and sodium chloride.

69.     On October 25, 2011, the USPTO issued a reexamination certificate determining that amended claim 6 and new claims 12-16 are patentable over the materials submitted by Senju and Kyorin in the reexamination.  These claims read as follows:

> 6.  A method for raising corneal permeability of an aqueous pharmaceutical Gatifloxacin eye drop solution comprising Gatifloxacin or its salt, having a pH from above 5 to about 6 containing from about 0.3 to about 0.8 w/v% Gatifloxacin or its salt which comprises incorporating about 0.01 w/v% disodium edetate into [eye drops containing Gatifloxacin or its salt] said Gatifloxacin eye drop solution.
>
> 12.  An aqueous liquid pharmaceutical eye drop composition which comprises from about 0.3 to about 0.8 w/v% Gatifloxacin or its salt, about 0.01 w/v% disodium edetate, and wherein the aqueous liquid pharmaceutical composition has a pH from about 5 to about 6.
>
> 13.  The aqueous liquid pharmaceutical eye drop composition according to claim 12, comprising about 0.3 w/v% Gatifloxacin or its salt.

13

14.  The aqueous liquid pharmaceutical eye drop composition according to claim 12, comprising about 0.5 w/v% Gatifloxacin or its salt.

15.  The aqueous liquid pharmaceutical eye drop composition according to claim 12, comprising at least one isotonic agent selected from the group consisting of sodium chloride, potassium chloride, glycerin, mannitol and glucose.

16.  The aqueous liquid pharmaceutical eye drop composition according to claim 14, wherein the at least one isotonic agent is sodium chloride.

70.     In the Examiner's Statement of Reasons for Patentability and/or Confirmation, the

Examiner states that the prior art fails:

to teach or reasonably suggest, alone or in combination…an aqueous liquid pharmaceutical eye drop composition that comprises the claimed amounts of gatifloxacin (from about 0.3 w/v% to about 0.8 w/v% gatifloxacin or its salt) and the incorporation of disodium edetate in the particular amounts that are recited in the claims (about 0.01[sic] w/v% disodium edetate) at a pH from about 5 to about 6 (**claim 12**).

71.     The Examiner further suggested that claim 12 was patentable because Senju and

Kyorin submitted evidence of a secondary consideration that favored patentability—unexpected

results of increased corneal permeability for the claimed compositions, without evidence of other

secondary considerations.

72.     But for Senju's and Kyorin's fraud on the USPTO, the Examiner would not have

reached these conclusions and the reexamined claims of the '045 patent would not have issued.

**H.    Defendants used the delay caused by Defendants' anti-competitive conduct to eliminate Apotex as a competitor in the market and deny patients access to a low cost gatifloxacin ophthalmic solution product.**

73.     On information and belief, after the District Court found claims 1-3 and 6-9 of the

'045 patent invalid in July 2010, Allergan stopped marketing and promoting Zymar® to

physicians and marketed and promoted Zymaxid® instead.

74.     On information and belief, Allergan stopped its promotion of Zymar® to

14

physicians in order to dissuade physicians from prescribing Zymar® and to encourage physicians to switch all of their prescriptions for gatifloxacin ophthalmic solution from Zymar® to Zymaxid®.

76. During the delay resulting from Allergan's anticompetitive conduct, Allergan's efforts were successful in effectively removing Zymar® from the market. The intended and actual effect of this conduct was to deny consumer access to a low-cost generic gatifloxacin ophthalmic solution product.

**I.    Defendants file a second lawsuit against Apotex's gatifloxacin ophthalmic solution, 0.3%, alleging infringement of the reexamined claims in an attempt to further their monopoly over gatifloxacin ophthalmic formulations.**

76. On August 19, 2011, Apotex's ANDA for gatifloxacin ophthalmic solution, 0.3%, received final approval from FDA. Apotex's ANDA for gatifloxacin ophthalmic solution, 0.3%, is listed in the Orange Book with an AT designation, meaning that it is considered a therapeutic equivalent of Zymar®.

77. On November 28, 2011, Defendants filed a second lawsuit against Apotex seeking a declaratory judgment that Apotex's gatifloxacin ophthalmic solution, 0.3%—the same product accused of infringing the '045 patent in the first lawsuit—infringes reexamined claims 6 and 12-16 of that patent.

78. On information and belief, Defendants filed the second lawsuit asserting the '045 patent despite knowing that Apotex's gatifloxacin ophthalmic solution, 0.3%, did not infringe any valid and enforceable claim of the '045 patent.

79. Further, on information and belief, Defendants filed the second lawsuit despite knowing that the claims and relief sought were precluded by the doctrines of claim preclusion and/or claim splitting.

00183382

80.    Defendants filed this second lawsuit in an effort to prevent Apotex from marketing its ANDA product.

## IV.    CLAIMS FOR RELIEF

### Count 1:  Monopolization in violation of Section 2 of the Sherman Act

81.    Apotex repeats and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

82.    Allergan possesses monopoly power in the market for gatifloxacin ophthalmic solution, which includes Zymar®, Zymaxid®, and generic equivalents thereof.

83.    Allergan has willfully maintained, and unless restrained by the Court will continue to willfully maintain, that power by anticompetitive and unreasonably exclusionary conduct.  Allergan has acted with an intent to illegally maintain its monopoly power in the gatifloxacin ophthalmic solution market, and its illegal conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

84.    At all material times, Allergan manufactured, promoted, distributed, and sold substantial amounts of gatifloxacin ophthalmic solution in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

85.    The relevant product market is gatifloxacin ophthalmic solution for the treatment of bacterial infections.

86.    Gatifloxacin ophthalmic solution is not reasonably interchangeable with other products that treat bacterial infections.

87.    Gatifloxacin ophthalmic solutions are the only approved quinolone antibiotic ophthalmic solutions that contain the preservatives and permeability enhancers disodium edetate and benzalkonium chloride, which Allergan advertises as allowing for increased microbial

16

resistance in comparison to other quinolone antibiotic ophthalmic solution products.

88.     Allergan maintains monopoly pricing power in the gatifloxacin ophthalmic

solution market.

89.     Allergan could and did impose significant, non-transitory price increases without

losing sufficient sales to render gatifloxacin ophthalmic solution unprofitable.

90.     Allergan has a 100% market share in the gatifloxacin ophthalmic solution market.

91.     The relevant geographic market is the United States and its territories.

92.     Apotex has been injured in its business and property by reason of Allergan's

unlawful monopolization.  Apotex has not only been unlawfully delayed and excluded from

entering the market for gatifloxacin ophthalmic solution, but will continue to be delayed and

blocked from entering the market for gatifloxacin ophthalmic solution because of Allergan's

unlawful actions unless Allergan's anticompetitive actions are enjoined.

93.     But for Defendants' unlawful actions, consumers would currently be able to

benefit from the presence of a low-cost generic gatifloxacin ophthalmic solution, 0.3%,

alternative to Zymar® that Apotex could and would have supplied.

94.     Because Allergan has stopped selling and promoting Zymar® and is now

promoting and selling Zymaxid® instead, consumers have not yet been able to benefit from the

presence of any generic gatifloxacin alternative and may not be able to benefit from a generic

gatifloxacin alternative for the foreseeable future.

95.     As a result of Defendants' anticompetitive conduct, consumers have been

deprived of a low-cost generic gatifloxacin ophthalmic solution product.

96.     Because of Defendants' anticompetitive conduct, Apotex has been further

damaged and will not be able to enjoy the benefits provided to the first filer of an ANDA,

00183382

namely the 180 day exclusivity period that it would otherwise have enjoyed but for Defendants'

unlawful conduct.

97.     Because Apotex would have been the first generic on the market, it would have

been able to enjoy greater sales in future years due to the momentum that would have been

achieved with its first entry, even if other generics were ultimately able to successfully challenge

the narrowed claims of the Defendants' reexamined patent and enter the market thereafter.

98.     Apotex is entitled to recover treble damages for its injuries under Section 4 of the

Clayton Act, 15 U.S.C. § 15.

**Count 2:  Conspiracy to Monopolize in violation of Section 2 of the Sherman Act**

99.     Apotex repeats and incorporates by reference the allegations in the preceding

paragraphs as if fully set forth herein.

100.    Kyorin, Senju, and Allergan have deliberately contracted, combined, or conspired

with the specific intent to achieve a monopoly and have committed the overt acts described

herein in furtherance of the conspiracy in violation of Section 2 of the Sherman Act, 15 U.S.C. §

2.

101.    At all material times, Defendants manufactured, promoted, distributed, and sold

substantial amounts of gatifloxacin ophthalmic solution in a continuous and uninterrupted flow

of commerce across state and national lines and throughout the United States.

102.    The relevant product market is gatifloxacin ophthalmic solution for the treatment

of bacterial infections.

103.    Gatifloxacin ophthalmic solution is not reasonably interchangeable with other

products that treat bacterial infections.

104.    Gatifloxacin ophthalmic solutions are the only approved quinolone antibiotic

ophthalmic solutions that contain the preservatives and permeability enhancers disodium edetate and benzalkonium chloride, which Allergan advertises as allowing for increased microbial resistance in comparison to other quinolone antibiotic ophthalmic solution products.

105.    Allergan maintains monopoly pricing power in the gatifloxacin ophthalmic solution market.

106.    Allergan could and did impose significant, non-transitory price increases without losing sufficient sales to render gatifloxacin ophthalmic solution unprofitable.

107.    Allergan has a 100% market share in the gatifloxacin ophthalmic solution market.

108.    The relevant geographic market is the United States and its territories.

109.    Apotex has been injured in its business and property by reason of Defendants' conspiracy.  Apotex has not only been unlawfully delayed and excluded from entering the market for gatifloxacin ophthalmic solution, but will continue to be delayed and blocked from entering the market for gatifloxacin ophthalmic solution because of Allergan's unlawful actions unless Allergan's anticompetitive actions are enjoined.

110.    But for Defendants' unlawful actions, consumers would currently be able to benefit from the presence of a low-cost generic gatifloxacin ophthalmic solution, 0.3%, alternative to Zymar® that Apotex could and would have supplied.

111.    Because Allergan has stopped selling and promoting Zymar® and is now promoting and selling Zymaxid® instead, consumers have not yet been able to benefit from the presence of any generic gatifloxacin alternative and may not be able to benefit from a generic gatifloxacin alternative for the foreseeable future.

112.    As a result of Defendants' anticompetitive conduct, consumers have been deprived of a low-cost generic gatifloxacin ophthalmic solution product.

00183382

113.    Because of Defendants' anticompetitive conduct, Apotex has been further damaged and will not be able to enjoy the benefits provided to the first filer of an ANDA, namely the 180 day exclusivity period that it would otherwise have enjoyed but for Defendants' unlawful conduct.

114.    Because Apotex would have been the first generic on the market, it would have been able to enjoy greater sales in future years due to the momentum that would have been achieved with its first entry, even if other generics were ultimately able to successfully challenge the narrowed claims of the Defendants' reexamined patent and enter the market thereafter.

115.    Apotex is entitled to recover treble damages for its injuries under Section 4 of the Clayton Act, 15 U.S.C. § 15.

**Count 3:  Unreasonable restraint of trade in violation of Section 1 of the Sherman Act**

116.    Apotex repeats and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

117.    Kyorin, Senju, and Allergan have illegally contracted, combined, or conspired to restrain trade in the gatifloxacin ophthalmic formulation market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

118.    At all material times, Defendants manufactured, promoted, distributed, and sold substantial amounts of gatifloxacin ophthalmic solution in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

119.    The relevant product market is gatifloxacin ophthalmic solution for the treatment of bacterial infections.

120.    Gatifloxacin ophthalmic solution is not reasonably interchangeable with other products that treat bacterial infections.

20

121.    Gatifloxacin ophthalmic solutions are the only approved quinolone antibiotic ophthalmic solutions that contain the preservatives and permeability enhancers disodium edetate and benzalkonium chloride, which Allergan advertises as allowing for increased microbial resistance in comparison to other quinolone antibiotic ophthalmic solution products.

122.    Allergan maintains monopoly pricing power in the gatifloxacin ophthalmic solution market.

123.    Allergan could and did impose significant, non-transitory price increases without losing sufficient sales to render gatifloxacin ophthalmic solution unprofitable.

124.    Allergan has a 100% market share in the gatifloxacin ophthalmic solution market.

125.    The relevant geographic market is the United States and its territories.

126.    Apotex has been injured in its business and property by reason of Defendants' conspiracy.  Apotex has not only been unlawfully delayed and excluded from entering the market for gatifloxacin ophthalmic solution, but will continue to be delayed and blocked from entering the market for gatifloxacin ophthalmic solution because of Allergan's unlawful actions unless Allergan's anticompetitive actions are enjoined.

127.    But for Defendants' unlawful actions, consumers would currently be able to benefit from the presence of a low-cost generic gatifloxacin ophthalmic solution, 0.3%, alternative to Zymar® that Apotex could and would have supplied.

128.    Because Allergan has stopped selling and promoting Zymar® and is now promoting and selling Zymaxid® instead, consumers have not yet been able to benefit from the presence of any generic gatifloxacin alternative and may not be able to benefit from a generic gatifloxacin alternative for the foreseeable future.

129.    As a result of Defendants' anticompetitive conduct, consumers have been

00183382

deprived of a low-cost generic gatifloxacin ophthalmic solution product.

130.    Because of Defendants' anticompetitive conduct, Apotex has been further damaged and will not be able to enjoy the benefits provided to the first filer of an ANDA, namely the 180 day exclusivity period that it would otherwise have enjoyed but for Defendants' unlawful conduct.

131.    Because Apotex would have been the first generic on the market, it would have been able to enjoy greater sales in future years due to the momentum that would have been achieved with its first entry, even if other generics were ultimately able to successfully challenge the narrowed claims of the Defendants' reexamined patent and enter the market thereafter.

132.    Apotex is entitled to recover treble damages for its injuries under Section 4 of the Sherman Act, 15 U.S.C. § 15.

## V.     JURY TRIAL DEMAND

133.    Under Federal Rule of Civil Procedure 38, Apotex demands a trial by jury of all issues so triable in the complaint.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Apotex respectfully prays that:

(a)     The acts alleged herein be adjudged and decreed to be unlawful and willful acts of monopolization in violation of Section 2 of the Sherman Act;

(b)     The acts alleged herein be adjudged and decreed to be unlawful and willful acts in restraint of trade in violation of Section 1 of the Sherman Act;

(c)     Apotex be awarded three-fold the damages determined to have been sustained, and that judgment be entered against Defendants in favor of Apotex;

22

(d)      Apotex recover its costs of suit, including reasonable attorneys' fees as provided by law;

(e)      Defendants be required to disgorge profits it made on Zymar® and Zymaxid® to Apotex;

(f)      Defendants be preliminarily and permanently enjoined from engaging in the unlawful acts alleged in this complaint; and

(g)      Apotex be granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

Dated:  February 16, 2012

*/s/ Francis J. Murphy*
Francis J. Murphy, DE I.D. No. 223
MURPHY & LANDON, P.A.
1011 Centre Road, Suite 210
Wilmington, Delaware  19805
(302) 472-8103
(302) 472-8135 (fax)
fmurphy@msllaw.com

**Attorneys for Plaintiffs
Apotex, Inc. and Apotex Corp.**

*Of Counsel:*

Alan B. Clement
LOCKE LORD LLP
Three World Financial Center
New York, NY  10281-2101
(212) 415-8600
(212) 303-2754 (fax)
aclement@lockelord.com

Keith D. Parr
Michael J. Gaertner

00183382

Scott B. Feder
David B. Abramowitz
Patrick C. Gallagher
LOCKE LORD LLP
111 South Wacker Dr.
Chicago, Illinois  60606
312-443-0700
312-443-0336 (fax)
sfeder@lockelord.com
dabramowitz@lockelord.com
pgallagher@lockelord.com

**Attorneys for Plaintiffs**
**Apotex, Inc. and Apotex Corp.**

00183382