IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

APOTEX, INC., and APOTEX CORP.,    )
    )
    Plaintiffs,    )
    )
    v.    )    C.A. No. 12-cv-0196 (SLR)
    )
SENJU PHARMACEUTICAL CO., LTD.    )
KYORIN PHARMACEUTICAL CO., LTD.    )
and ALLERGAN, INC.,    )
    )
    )
    Defendants.    )

**APOTEX'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS JOINT MOTION TO DISMISS**

Francis J. Murphy (#223)
**MURPHY & LANDON**
1011 Centre Road
Suite 210
Wilmington, DE  19805
(302) 472-8103
fmurphy@msllaw.com

Dated: October 20, 2014

# TABLE OF CONTENTS

**Page(s)**

NATURE AND STAGE OF PROCEEDINGS...........................................................................1

SUMMARY OF ARGUMENT.................................................................................................1

STATEMENT OF FACTS........................................................................................................2

Defendants sued Apotex on the '045 patent prompting a 30-month stay of FDA approval
    of Apotex's ANDA ...................................................................................................2

Allergan exploited the delay arising from the baseless litigation to switch consumers to
    gatifloxacin ophthalmic solution, 0.5%. ................................................................3

Defendants further delayed Apotex's market entry by filing sham motions and a second baseless
    lawsuit to ensure the success of the product switch..............................................4

ARGUMENT ..........................................................................................................................5

I.      Introduction..........................................................................................................5

II.     Courts recognize that the issue of the relevant market is highly factual and not
        usually susceptible to a motion to dismiss. ..........................................................7

III.    Courts in cases involving pharmaceutical products approve of markets similar to
        or narrower than the market Apotex alleges. ........................................................9

IV.     Apotex's complaint alleges a plausible relevant market.....................................13

CONCLUSION ....................................................................................................................17

## TABLE OF AUTHORITIES

Page(s)

CASES

*American Sales Company, Inc. v. Astrazeneca AB*,
    No. 10 Civ. 6062, 2011 WL 1465786 (S.D.N.Y April 14, 2011)............................................11

*Asahi Glass Co., Ltd. v. Pentech Pharmaceuticals, Inc.*,
    289 F. Supp. 2d 986 (N.D. Ill. 2003) ............................................................................11, 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................................................8

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
    813 F. Supp. 2d 569 (S.D.N.Y. 2011)..............................................................................10, 11

*Belfiore v. New York Times Co.*,
    654 F. Supp. 842 (D. Conn. 1986)........................................................................................13

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................................................7, 8

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007).................................................................................................8

*In re Cardizem CD Antitrust Litig.*,
    105 F. Supp. 2d 618 (E.D. Mich. 2000).................................................................................9

*Christopher v. Harbury*,
    536 U.S. 403 (2002)............................................................................................................7

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
    363 F. Supp. 2d 514 (E.D.N.Y. 2005) ......................................................................9, 10, 16

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
    136 F.3d 554 (8th Cir. 1998) ...............................................................................................8

*E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*,
    637 F.3d 435 (4th Cir. 2011) ...............................................................................................8

*Erickson v. Pardus*,
    551 U.S. 89 (2007)...............................................................................................................7

*Foundation for Interior Design Educ. Research v. Savannah Coll. of Art & Design*,
    244 F.3d 521 (6th Cir. 2001) ...............................................................................................8

*FTC v. Actavis, Inc.*,
  133 S.Ct. 2223 (2013) ............................................................................................13

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*,
  386 F.3d 485 (2d Cir. 2004) ....................................................................10, 15, 16

*Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*,
  960 F. Supp. 701 (S.D.N.Y. 1997) ......................................................................12

*Kaiser Foundation Health Plan, INc., v. Abbott Labs., Inc.*,
  552 F.3d 1033 (9th Cir. 2009) ..............................................................................12

*Kaiser Foundation v. Abbott Labs.*,
  No. CV 02-2443, 2009 WL 3877513 (C.D. Cal. Oct. 8, 2009) ..................11, 12, 13

*Knoll Pharms. Co., Inc. v. Teva Pharms. USA, Inc.*,
  No. 01 C 1646, 2001 WL 1001117 (N.D. Ill. Aug. 24, 2001) ................................9

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  467 F. Supp. 2d 74 (D.D.C. 2006) .......................................................................10

*Phillips v. County of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ...................................................................................7

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) .............................................................................8, 17

*In re Schering-Plough Corp.*,
  No. 9297, 2003 WL 22989651 (F.T.C. Dec. 8, 2003), *rev'd on other grounds*, 402
  F.3d 1056 (11th Cir. 2005) .....................................................................................9

*SigmaPharm, Inc. v. Mutual Pharmaceutical Co., Inc.*,
  454 Fed. Appx. 64 (3d Cir. 2011) ..........................................................................9

*Spirit Airlines, Inc. v. Northwest Airlines, Inc.*,
  431 F.3d 917 (6th Cir. 2005) ................................................................................15

*In re Terazosin Hydrochloride Antitrust Litig.*,
  352 F. Supp. 2d 1279 (S.D. Fla. 2005) ..............................................................9, 12

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ...................................................................................8

*Tunis Brothers Co. v. Ford Motor Co.*,
  952 F.2d 715 (3d Cir. 1991) ............................................................................12, 13

*TV Communications Network, Inc. v. Turner Network Television, Inc.*,
  964 F.2d 1022 (10th Cir. 1992) .......................................................................12, 13

00205379

*U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*,
   7 F.3d 986 (11th Cir. 1993) ..................................................................................15

*U.S. v. Archer-Daniels-Midland Co.*,
   866 F.2d 242 (8th Cir. 1988) ................................................................................15

*U.S. v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) ..............................................................................................14

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
   344 F.3d 1294 (11th Cir. 2003) ........................................................................... 12

*Wallach v. Eaton Corp.*,
   814 F. Supp. 2d 428 (D. Del. 2011) (Robinson, J.) ...............................................7

*West Penn Allegheny Health System, Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010)................................................................................7, 8

## OTHER AUTHORITIES

FED. R. CIV. P. 8(a)(2)................................................................................................7, 8

PHILLIP E. AREEDA AND HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF
   ANTITRUST PRINCIPLES AND THEIR APPLICATION 507a at 132 ...............................16

Rule 12(b)(6)................................................................................................................13

iv

Plaintiffs Apotex, Inc. and Apotex Corp. (collectively "Apotex") respectfully submit this answering brief in opposition to defendants' motion to dismiss Apotex's amended complaint.

## NATURE AND STAGE OF PROCEEDINGS

Apotex filed a complaint alleging, in part, that Allergan has illegally monopolized the market for gatifloxacin ophthalmic solution in violation of Section 2 of the Sherman Act and that Allergan, Senju, and Kyorin together have unlawfully acted in restraint of trade in violation of Section 1 of the Sherman Act. Defendants have asked the Court to dismiss all counts of Apotex's complaint for failure to allege a plausible relevant market.

## SUMMARY OF ARGUMENT

1. Because market definition is a highly fact-intensive inquiry, courts are loath to dismiss antitrust claims based on a purported failure to allege a proper relevant product market.

2. Contrary to defendants' mischaracterizations about "single product" markets, Apotex's complaint alleges that the relevant product market consists of Zymar, Zymaxid, and all generic bioequivalents of those two products. Further, such a market definition is not "suspect": in fact, many courts have approved of markets similar to or narrower than the market Apotex alleges.

3. Apotex's complaint alleges that Allergan successfully switched consumers from Zymar to Zymaxid without losing significant sales despite Zymaxid's increased price. These non-transitory price increases show that the gatifloxacin ophthalmic solution market is inelastic and thus that other antibiotic ophthalmic solution products are not reasonably interchangeable with gatifloxacin. The complaint further alleges that the reason gatifloxacin ophthalmic solutions are not interchangeable with other products is that gatifloxacin ophthalmic solutions are the only approved ophthalmic solutions that contain both disodium edetate and benzalkonium chloride. In addition, the complaint alleges that gatifloxacin has specific antibacterial properties

that provide for a unique spectrum of treatment that differs from other ophthalmic solution antibiotic products, including other ophthalmic solution quinolone products.  Under recognized antitrust case law, facts of this type are more than adequate to allege a plausible relevant market.

### STATEMENT OF FACTS

Apotex's amended complaint in this action (D.I. 36) alleges the following:

### Defendants sued Apotex on the '045 patent prompting a 30-month stay of FDA approval of Apotex's ANDA

In 2000, Kyorin and Senju licensed to Allergan the right to market aqueous liquid gatifloxacin ophthalmic products in the United States.  (D.I. 36, ¶21.)  The license included patent rights under U.S. Patent No. 6,333,045 ("the '045 patent"), which Allergan subsequently listed in FDA's Orange Book.  (*Id.*, ¶30.)

In 2002, Allergan filed New Drug Application ("NDA") No. 21-493 seeking approval to market gatifloxacin ophthalmic solution, 0.3%, under the brand name Zymar.  (*Id.*, ¶22.)  Unlike other quinolone ophthalmic antibiotic solutions, Zymar, Zymaxid, and their generic equivalents contain both disodium edetate and benzalkonium chloride as preservative and permeability enhancer excipients.  (*Id.*, ¶97.)  As noted in Kyorin's own '470 patent, gatifloxacin has specific antibacterial properties that provide for a unique spectrum of treatment that differs from other ophthalmic solution antibiotic products, including other ophthalmic solution quinolone products. (*Id.*, ¶96.)

Allergan began marketing Zymar in 2003 shortly after receiving FDA approval.  (*Id.*, ¶¶23-24.)  By 2009, Zymar's annual U.S. sales reached around $100 million.  (*Id.*, ¶25.)

In July 2007, Apotex filed ANDA No. 79-084 seeking approval to sell a generic gatifloxacin ophthalmic solution, 0.3%.  (*Id.*, ¶31.)  The ANDA contained a paragraph IV certification to the '045 patent.  (*Id.*, ¶33.)  Apotex sent defendants a notice letter explaining that

the claims of the '045 patent were invalid and thus that Apotex's proposed ANDA product would not infringe any valid claim of the '045 patent.  (*Id.*, ¶34.)

Defendants subsequently sued Apotex, and because they filed suit within 45 days after they received Apotex's notice letter, defendants enjoyed an automatic 30-month stay of FDA approval of Apotex's ANDA.  (*Id.*, ¶35.)

**Allergan exploited the delay arising from the baseless litigation to switch consumers to gatifloxacin ophthalmic solution, 0.5%.**

On June 12, 2009, Apotex received tentative approval of its ANDA for gatifloxacin ophthalmic solution, 0.3%, but the 30-month stay triggered by defendants' lawsuit had yet to expire and thus Apotex could not receive final approval or market its ANDA product.  (*Id.*, ¶40.) Recognizing that the claims of the '045 patent were likely invalid, that their lawsuit against Apotex was baseless, and thus that Apotex would eventually gain approval to market its product, Allergan began taking active steps to preserve its monopoly.  Specifically, on July 30, 2009, while the 30-month stay was still effective, Allergan filed NDA No. 22-548 for gatifloxacin ophthalmic solution, 0.5%, which Allergan later marketed under the brand name Zymaxid.  (*Id.*, ¶41.)

Allergan filed the Zymaxid NDA in order to switch physicians and other consumers from Zymar to Zymaxid before Apotex was able to bring its gatifloxacin ophthalmic solution to the market.  (*Id.*, ¶44.)  As part of this strategy, Allergan discontinued all of its marketing and promotional activities for Zymar, directing its marketing and promotional efforts to Zymaxid instead.  (*Id.*, ¶¶48, 105.)  This had the effect of encouraging consumers to switch all of their prescriptions for gatifloxacin ophthalmic solution from Zymar to Zymaxid.  (*Id.*)  Allergan carried out this switching strategy even though Zymaxid is not clinically or therapeutically superior to Zymar.  (*Id.*, ¶¶49-51.)

3

Allergan's strategy succeeded. Allergan was able to switch physicians and other consumers from Zymar to the more costly Zymaxid and was able to maintain its Zymaxid sales despite several Zymaxid price increases during the period in question. (*Id.*, ¶¶99-101, 117-119, 135-137.) In other words, physicians and other consumers continued to prescribe and purchase Zymaxid instead of other, less costly non-gatifloxacin ophthalmic antibiotic solutions despite Zymaxid's increased price. (*Id.*)

**Defendants further delayed Apotex's market entry by filing sham motions and a second baseless lawsuit to ensure the success of the product switch.**

As noted above, in 2007, Allergan sued Apotex in this Court alleging that Apotex's ANDA No. 79-084 for gatifloxacin ophthalmic solution, 0.3%, infringes certain claims of the '045 patent. On June 14, 2010, the Court entered an opinion and judgment finding all asserted patent claims invalid as obvious. (*Id.*, ¶52.) At this point, Allergan had not had enough time to switch prescribers from one product to the other. To obtain more time for its switching strategy, Allergan filed a motion seeking a new trial and/or reconsideration of the Court's judgment of obviousness of a single claim on the basis that a fundamental principle of science—the inverse relationship between precipitation and solubility—was somehow unproven at trial (even though Allergan's own expert had relied on this very relationship in his infringement testimony). In its motion, Allergan threatened that if Apotex chose to launch its product upon final approval, Allergan would seek injunctive relief and damages. (*Id.*, ¶¶53-54.)

The Court entered final judgment in Apotex's favor on December 20, 2011. (*Id.*, ¶58.) On appeal, the Federal Circuit summarily affirmed the Court's judgment. (*Id.*, ¶59.)

In the intervening period, on August 19, 2011, Apotex received final approval for its ANDA for gatifloxacin ophthalmic solution 0.3%, which received an "AT" designation, meaning that it should be considered a therapeutic equivalent of Zymar. (*Id.*, ¶80.) To ensure that the

4

product switching strategy remained a success, defendants filed a second lawsuit against

Apotex's ANDA alleging infringement of re-examined claims of the '045 patent on November

28, 2011.  (*Id.*, ¶81.)  On September 17, 2012, the Court dismissed the second lawsuit on claim

preclusion grounds finding that the re-examined claims "did not create a new cause of action

against the same previous defendants and accused product."  (*Id.*, ¶83.)  On March 31, 2014, the

Federal Circuit affirmed the Court's dismissal of the second lawsuit on claim preclusion grounds.

(*Id.*, ¶85.)

Defendants do not assert in their motion that Apotex has failed to state a claim for

antitrust injury, fraud on the patent office, or sham litigation.  Nor have defendants attacked the

amended complaint on any other grounds except for the narrow issue raised in their current

motion.

## ARGUMENT

### I.    Introduction

Every major characterization in defendants' motion to dismiss does not withstand

scrutiny.  For example, Apotex's market allegations are not confined solely to the six paragraphs

in its counts that defendants exclusively cite and discuss.  (*See* Defendants' Br. at 12.)

Defendants ignore numerous other factual allegations throughout Apotex's amended complaint

that, taken as a whole, adequately allege a plausible relevant market.

Moreover, Apotex does not allege a market based on a "single product" (*see* Defendants'

Br. at 8): the market consists of two different brand-name products and all generic bioequivalents

of those two products.  Thus the alleged market is not as narrow as defendants would have the

Court believe.  Further, the market Apotex has alleged is not "suspect" (*see id.*): many courts

have approved of markets of scope similar to that alleged here and some of even narrower scope.

Further still, contrary to defendants' description, Apotex has done more than allege a product with "unique" characteristics: it has alleged that Allergan successfully switched consumers from Zymar to Zymaxid without losing significant sales despite Zymaxid's increased price. (D.I. 36, ¶¶99-101.) These non-transitory price increases show that the gatifloxacin ophthalmic solution market is inelastic and thus that other antibiotic ophthalmic solution products are not reasonably interchangeable with gatifloxacin. The complaint also alleges why gatifloxacin ophthalmic solutions are not interchangeable with other products, namely, because gatifloxacin ophthalmic solutions are the only approved ophthalmic solutions with two separate permeability enhancers (disodium edetate and benzalkonium chloride) and because gatifloxacin has a unique therapeutic profile. (*Id.*, ¶97, ¶98.) Further, the complaint alleges that gatifloxacin has unique antibacterial properties that provide for a spectrum of treatment that differs from other ophthalmic solution antibiotic products, including other ophthalmic solution quinolone products discussed in defendants' motion. (*Id.*, ¶96.)

Defendants' assertion that there are "a multiplicity of product options that treat the same conditions as Zymar and Zymaxid" (Defendants' Br. at 15), fails to explain why a *multiplicity* of generic applicants have sought approval of ANDA's for Zymar and Zymaxid. (*See* 07-779-SLR, 12-159-SLR (Apotex); 11-271-SLR, 11-439-SLR (Lupin); 11-926-SLR, 11-1059-SLR (Hi-Tech); 13-851-SLR (Strides); 14-579-SLR (Aurobindo); 14-923-SLR (Actavis); 14-1105-SLR (Micro Labs).) If defendants were correct that, in the physician's mind, Zymar and Zymaxid are readily interchangeable with a host of other products, there would be little incentive for each of these generic applicants to file their ANDA, a significant monetary investment that also carries the risk of a potential lawsuit.

6

00205379

It seems that, at the end of the day, defendants simply *disagree* that Apotex's allegations demonstrate a lack of interchangeability, and ask the Court to make factual determinations about how doctors use defendants' products based on material outside the four corners of the complaint that defendants unconvincingly insist they are not offering "for their truth."  (Defendants' Br. at 15.)  That is not a legitimate basis for granting a motion to dismiss.

Apotex's allegations are more than sufficient to state a plausible relevant market under the prevailing pleading standards, to which we now turn.

## II.    Courts recognize that the issue of the relevant market is highly factual and not usually susceptible to a motion to dismiss.

When reviewing a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff."  *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428, 434 (D. Del. 2011) (Robinson, J.) (citing *Erickson v. Pardus*, 551 U.S. 89, 94, 127 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002)).

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  Thus a complaint need only "contain factual allegations that, taken as a whole, render the plaintiff's entitlement to relief plausible." *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 569 n. 14 (2007)).  This "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."  *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

Importantly, *Twombly* "expressly rejected the notion that a '"heightened" pleading standard' applies in antitrust cases, and *Iqbal* made clear that Rule 8's pleading standard applies with the same level of rigor in '"all civil actions."'"  *West Penn Allegheny Health System*, 627

00205379

F.3d at 98 (quoting *Twombly*, 550 U.S. at 569 n.14 and *Ashcroft v. Iqbal*, 556 U.S. 662, 1 (2009)); *see also Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. 2007) ("Antitrust claims … are subject to the notice-pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'").  Thus "it is inappropriate to apply *Twombly*'s plausibility standard with extra bite in antitrust and other complex cases." *West Penn Allegheny Health System*, 627 F.3d at 98.

Several courts of appeal, including the Third Circuit, have warned against dismissing antitrust claims based on a supposed failure to properly allege a relevant product market.  *See*, *e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (explaining that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers").  The Second Circuit, well-versed in antitrust law, has noted that "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001); *see also E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 443 (4th Cir. 2011) (noting that "dismissal of an antitrust claim for failure to adequately plead the relevant market can be problematic"); *Foundation for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery."); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) ("[C]ourts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery.").

00205379

### III. Courts in cases involving pharmaceutical products approve of markets similar to or narrower than the market Apotex alleges.

Defendants simply ignore multiples cases where courts have approved of relevant markets similar to the one Apotex alleges here. *See*, *e.g.*, *SigmaPharm, Inc. v. Mutual Pharmaceutical Co., Inc.*, 454 Fed. Appx. 64, 69 (3d Cir. 2011) (agreeing that relevant market included only Skelaxin and its AB-rated counterparts); *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1319 n.40 (S.D. Fla. 2005) ("Abbott has power in the relevant market, which is the market for Hytrin and its generic bioequivalent forms of terazosin hydrochloride."); *see also In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 680-81 (E.D. Mich. 2000) (denying motion to dismiss allegations of a relevant market of branded and generic versions of Cardizem CD); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514, 522-23 (E.D.N.Y. 2005) (limiting relevant market to brand and generic versions of ciprofloxacin); *In re Schering-Plough Corp.*, No. 9297, 2003 WL 22989651, at *16, n.47 (F.T.C. Dec. 8, 2003) (recognizing a viable market definition could include K-Dur 20 and its generic equivalents), *rev'd on other grounds*, 402 F.3d 1056 (11th Cir. 2005); *Knoll Pharms. Co., Inc. v. Teva Pharms. USA, Inc.*, No. 01 C 1646, 2001 WL 1001117, at *10-*11 (N.D. Ill. Aug. 24, 2001) (denying motion to dismiss where counterclaims limited relevant product market to hydrocodone bitartrate/ibuprofen).

Of particular interest here is the *Ciprofloxacin* case, where the court rejected the argument that a market confined to the fluoroquinolone ciprofloxacin was too narrow. Bayer, the defendant in that case, argued that ciprofloxacin competed "in the larger market of fluoroquinolones, which includes other drugs such as Levaquin, Floxin and Noraxin" because Bayer's ciprofloxacin product had been losing market share in light of the availability of these other products. *Ciprofloxacin*, 363 F. Supp. 2d at 523. The court rejected this argument and

9

held that because Bayer was able to maintain a high price for its product, it was "reasonable to accept plaintiffs' contention and conclude both that the relevant market is for ciprofloxacin and that Bayer had market power within that market." *Id.*

The argument the court rejected in *Bayer* is the same argument defendants make here—namely, one quinolone is just like any other quinolone and that "[a]nyone whose doctor has ever prescribed them an antibiotic knows that there are numerous choices available to treat infections." (Defendants' Br. at 16.)  The court in *Bayer* rejected this argument in light of the fact that Bayer was able to maintain high prices for its product despite the availability of other fluoroquinolones.  So, too, here, Apotex alleges, as described in greater detail below, that Allergan was able to increase the price of its gatifloxacin ophthalmic solution without creating a greater demand for other quinolone ophthalmic solutions.  Accordingly, defendants' odd supposition about what "anyone … knows" cannot defeat properly pled factual allegations of cross-elasticity that, taken as true, demonstrate that the quinolones are *not* interchangeable.

Moreover, the market Apotex has alleged here is broader than other relevant markets that courts have approved of in antitrust cases.  For instance, in *Geneva*, the Second Circuit limited the relevant market to *only generic versions* of a single drug, warfarin sodium.  *See Geneva Pharmaceuticals Technology Corp.*, 386 F.3d at 496.  Thus the court there explicitly excluded the brand-name drug from the relevant market.  *See id.*; *see also In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 81-82 (D.D.C. 2006) (limiting the relevant market to generic versions of the drugs at issue).  In other words, the court in *Geneva* accepted a market definition that was much narrower than the market Apotex alleges here.

Allergan erroneously relies on *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569 (S.D.N.Y. 2011), which is distinguishable for several reasons.  First, the market

00205379

definition that the court rejected was narrower than the market alleged here—it included only the brand-name products at issue.  *See Bayer Schering Pharma AG*, 813 F. Supp. 2d at 576.  Second, unlike Apotex's allegations here, Sandoz did not allege that its proposed market was inelastic.  *See id.* at 577-78.  Finally, the court gave unusually close scrutiny to Sandoz's market allegations in the amended counterclaims because those allegations "directly contradict[ed] assertions made in [Sandoz's] original counterclaims."  *Id.* at 576.

*American Sales Company, Inc. v. Astrazeneca AB*, No. 10 Civ. 6062, 2011 WL 1465786 (S.D.N.Y April 14, 2011), on which defendants also rely, is similarly inapposite.  There, the plaintiff "failed to allege any product characteristics or evidence of consumer buying patterns that limit [the product at issue's] interchangeability of use or cross-elasticity of demand." *American Sales Company*, 2011 WL 1465786 at *3.  In contrast, as explained below, Apotex alleges that gatifloxacin ophthalmic solutions have unique product characteristics *and* that, as evidenced by Allergan's successful switching scheme, the market for gatifloxacin ophthalmic solutions is inelastic—that is, consumers continued to buy Zymaxid despite its increased price over other quinolone ophthalmic solutions.

Equally distinguishable are the remaining three pharmaceutical cases that defendants cite—*Kaiser Foundation v. Abbott Labs.*, No. CV 02-2443, 2009 WL 3877513 (C.D. Cal. Oct. 8, 2009) and *Asahi Glass Co., Ltd. v. Pentech Pharmaceuticals, Inc.*, 289 F. Supp. 2d 986 (N.D. Ill. 2003).

In *Kaiser*, the district court was considering summary judgment motions on remand from the Ninth Circuit.  Kaiser had alleged that the relevant market consisted of Abbott's product Hytrin and its bioequivalent counterparts.  *See Kaiser*, 2009 WL 3877513 at *9.  The court had the benefit of a full record, which included testimony from experts about the reality of the market

at issue. *See*, *e.g.*, *id.* at \*8. Moreover, another district court, in an earlier iteration of essentially the same case, concluded that "Abbott has power in the relevant market, which is the market for Hytrin and its generic bioequivalent forms of terazosin hydrochloride." *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d at 1319 n.40. And neither the Eleventh Circuit nor the Ninth Circuit called that conclusion into question. *See Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 344 F.3d 1294 (11th Cir. 2003); *Kaiser Foundation Health Plan, INc., v. Abbott Labs., Inc.*, 552 F.3d 1033 (9th Cir. 2009).

Although it is true that Judge Posner in *Asahi Glass* noted in passing that it cannot "merely be assumed" that paroxetine is a separate market, *Asahi Glass Co.*, 289 F. Supp. 2d at 996, he also concluded that there are reasons to believe that paroxetine may in fact be a relevant market. *See id.* ("[T]here are therapeutic differences even within the category of SSRIs that may warrant treating paroxetine as a separate market."). More important for our purposes here, Judge Posner also noted that his brief discussion of the market was a "detail" and that Asahi's market definition "would not be itself a basis for granting a motion to dismiss." *Id.* at 995.

In short, these cases do not stand for the proposition that markets limited to the brand-name drug and its generic counterparts are insufficient to survive a motion to dismiss. Much less do these cases stand for the proposition that a complaint must demonstrate that absolutely no alternative products exist.

The bulk of defendants' other cited cases do not involve pharmaceutical markets and thus are not probative in this context. It is most uninformative to compare the market for "Ford tractors," *Tunis Brothers Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991), "tickets for travel on TWA between certain city pairs," *Global Discount Travel Services, LLC v. Trans World Airlines*, *Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997), or "the TNT channel," *TV*

00205379

*Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992), with the market for gatifloxacin ophthalmic solutions, which involves physicians, patients, and the determination of interchangeability across the spectrum of other ophthalmic antibiotics. So, too, some of defendants' cited cases are rulings on jury or court findings (*see Tunis Brothers Co. v. Ford Motor Co.*, 952 F.2d at 722) or summary judgment (*see Kaiser Foundation*, 2009 WL 3877513, at *9-*10; *Belfiore v. New York Times Co.*, 654 F. Supp. 842, 845 (D. Conn. 1986)), so it is obvious that all of those market allegations either withstood a motion to dismiss or were never even challenged at the Rule 12(b)(6) stage.

Tellingly, defendants ignore the one case that suggests the outcome of the entire single-product market issue here, namely, the Supreme Court's decision in *FTC v. Actavis, Inc.*, 133 S.Ct. 2223 (2013). That case percolated through the lower courts, went through multiple appeals, ultimately finding its way to the Supreme Court, and at no time did any court question the viability of the market at issue in that case, a single-product pharmaceutical market (testosterone gel), even though other forms of testosterone were readily available. To be sure, if defendants were correct that a single product can never constitute a relevant antitrust market, then FTC has wasted countless taxpayer dollars pursuing antitrust actions across the pharmaceutical industry, specifically targeting so-called reverse-payment settlements in single-product markets—*i.e.*, the precise issue involved in the *Actavis* case.

## IV.    Apotex's complaint alleges a plausible relevant market.

Apotex's complaint adequately alleges a plausible relevant product market. Defendants isolate only six paragraphs from Apotex's counts and ignore Apotex's other market-related factual allegations, which are, of course, incorporated into each of the counts by reference. (*See* D.I. 36, ¶¶ 91, 110, 128.) Read in its entirety, as defendants refuse to do, Apotex's complaint

13

more than adequately alleges that gatifloxacin ophthalmic solution delineates the contours of a plausible market definition.

For purposes of Section 2 of the Sherman Act, a market is defined by the reasonable interchangeability of the products and the cross-elasticity of demand for those products. *See U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394-95 (1956).

First, it is necessary to correct a misconception conveyed in defendants' motion. Contrary to defendants' representation, Apotex does not allege a "single-product market." Rather, the complaint alleges a market consisting of Allergan's Zymar and Zymaxid products and their respective bioequivalent, AB-rated generic counterparts. Thus Apotex's alleged market is not limited to just "the products that the alleged monopolist happens to sell." (Defendants' Br. at 8.)

The relevant market Apotex has alleged is plausible. As the complaint alleges, the products in this market are not reasonably interchangeable with any other antibiotic ophthalmic solution products. In particular, Apotex's allegations demonstrate that elasticity in the gatifloxacin ophthalmic solution market is, at best, low. Apotex alleges that Allergan engaged in an anticompetitive scheme to switch consumers from Zymar to Zymaxid. In undertaking this scheme, Allergan was able to retain its consumers even though Zymaxid costs more than other quinolone ophthalmic solutions that Allergan now argues compete with Zymaxid.

If Zymaxid were interchangeable with other quinolone antibiotic ophthalmic solutions, as Allergan contends, then one would have expected consumers to blanch at the high price that Allergan demands for its gatifloxacin ophthalmic solution and, instead, migrate to the much less expensive quinolone ophthalmic solutions that are available, including the generic versions of other quinolone ophthalmic solutions. The fact that consumers continued to buy Allergan's

14

product, despite its price increase and despite the ready availability of lower-priced quinolone antibiotic ophthalmic solutions, shows low elasticity of demand in the market for gatifloxacin ophthalmic solutions, and thus gatifloxacin ophthalmic solutions are not reasonably interchangeable with other quinolone antibiotic ophthalmic solutions.  *See*, *e.g.*, *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 933 (6th Cir. 2005) (finding that evidence of low cross-elasticity of demand raised a triable issue concerning the contours of the relevant market); *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.,* 386 F.3d 485, 496 (2d Cir. 2004) (holding that the district court erred in including a more expensive branded version of a drug in the relevant market along with cheaper generic versions given evidence of inelasticity); *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F.3d 986 (11th Cir. 1993) (excluding premium brand version from the relevant product market even though it was a functional substitute for lower-priced versions included in the market); *U.S. v. Archer-Daniels-Midland Co.*, 866 F.2d 242 (8th Cir. 1988) (rejecting a broad market definition where products were shown to be functionally interchangeable but price differences existed between the products).

Apotex further alleges that gatifloxacin ophthalmic solutions are not reasonably interchangeable with other quinolone antibiotic ophthalmic solutions because gatifloxacin ophthalmic solutions contain both disodium edetate and benzalkonium chloride as preservative and permeability enhancer excipients, increasing the drug's efficacy and shelf life.  And the complaint  alleges that gatifloxacin has unique antibacterial properties that provide for a spectrum of treatment that differs from other ophthalmic solution antibiotic products, including other ophthalmic solution quinolone products discussed in defendants' motion.  Defendants apparently disagree with the substance of these allegations (as if that were a reason to dismiss a

15

complaint), and argue that all Allergan sells are eye drops and that consumers can readily substitute any other eye drop for gatifloxacin.

Defendants' arguments miss the mark.  First, according to the allegations in Apotex's complaint, doctors do not view gatifloxacin ophthalmic solutions as interchangeable with other antibiotic eye drops.  Those allegations must be taken as true on a motion to dismiss.  It is certainly not proper for the Court, in deciding a motion to dismiss, to weigh competing versions of the facts to determine which side's version is true.

Second, defendants erroneously argue that gatifloxacin's unique properties do not alone warrant a market confined to gatifloxacin ophthalmic solutions since other ophthalmic antibiotic solutions may treat some of the same conditions as gatifloxacin.  Functionally substitutable goods are not in the same market as the product at issue unless the availability of one of the products effectively limits the price of the other product to something approaching competitive levels.  *See* PHILLIP E. AREEDA AND HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION 507a at 132.  In other words, a product is not a genuine substitute, and thus is not in the same market for antitrust purposes, if it does not exhibit significant cross-price elasticity of demand with, and thus does not constrain the price of, the product at issue.  *See*, *e.g.*, *Geneva*, 386 F.3d at 490-91, 500 (relevant market did not include other drugs that functioned as oral anticoagulants, prevented strokes, or prevented heart attacks); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F.Supp. 2d at 522-23 (limiting relevant market to Ciprofloxacin, and excluding other antibiotics).  And, as seen above, Apotex has alleged that the gatifloxacin ophthalmic solution market is inelastic.  Accordingly, it would be error to conclude—on a motion to dismiss, no less—that other quinolone antibiotic ophthalmic solutions compete in the same market as gatifloxacin ophthalmic solutions.

00205379

## CONCLUSION

The Court must not lose sight of the Third Circuit's admonition in *Queen City Pizza* that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." 124 F.3d at 436. Here, the amended complaint contains more than sufficient allegations to warrant the factual inquiry contemplated in *Queen City Pizza*. Because Apotex's allegations plausibly define a relevant market, the Court should *deny* the motion to dismiss.

Respectfully submitted this 20th day of October, 2014.

**MURPHY & LANDON**

*/s/ Francis J. Murphy*
Francis J. Murphy (#223)
1011 Centre Road
Suite 210
Wilmington, DE  19805
(302) 472-8103
fmurphy@msllaw.com

| | |
|---|---|
| *Of Counsel:*<br><br>Alan B. Clement<br>LOCKE LORD LLP<br>Three World Financial Center<br>New York, NY  10281-2101<br>(212) 415-8600<br>(212) 303-2754 (fax)<br>aclement@lockelord.com<br><br>**Attorneys for Plaintiffs**<br>**Apotex, Inc. and Apotex Corp.** | Keith D. Parr<br>Michael J. Gaertner<br>Scott B. Feder<br>David B. Abramowitz<br>Andy J. Miller<br>LOCKE LORD LLP<br>111 South Wacker Dr.<br>Chicago, Illinois  60606<br>312-443-0700<br>312-443-0336 (fax)<br>kparr@lockelord.com<br>mgaertner@lockelord.com<br>sfeder@lockelord.com<br>dabramowitz@lockelord.com<br>amiller@lockelord.com |

00205379

# CERTIFICATE OF SERVICE

The undersigned on oath states that foregoing **APOTEX'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS** was served on the following counsel by electronic filing with the Court's ECF system on this 20th day of October, 2014.

| | |
|---|---|
| Richard D. Kirk (#0922)<br>Stephen B. Brauerman (#4952)<br>BAYARD, P.A.<br>222 Delaware Avenue, Suite 900<br>Wilmington, DE  19801<br>(302) 655-5000<br>rkirk@bayardlaw.com<br>sbrauerman@bayardlaw.com<br>*Attorneys for Defendant Senju Pharmaceutical Co. Ltd.* | Jack B. Blumenfeld (#1014)<br>Regina S.E. Murphy (#5648)<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>1201 North Market Street<br>Wilmington, DE  19801<br>(302) 658-9200<br>jblumenfeld@mnat.com<br>rmurphy@mnat.com<br>*Attorneys for Defendant Allergan, Inc.* |
| Benjamin J. Schladweiler  (#4601)<br>David E. Ross  (#5228)<br>SEITZ ROSS ARONSTAM & MORITZ LLP<br>100 South West Street, Suite 400<br>Wilmington, DE  19801<br>(302) 576-1600<br>bschaldweiler@seitzross.com<br>dross@seitzross.com<br>*Attorneys for Kyorin Pharmaceutical Co., Ltd.* | |

**MURPHY & LANDON**

*/s/ Francis J. Murphy*
Francis J. Murphy (#223)
1011 Centre Road
Suite 210
Wilmington, DE  19805
(302) 472-8103
fmurphy@msllaw.com